Good morning and may it please the court, my name is Benjamin Rosenberg. I represent the defendant at Palat, Howard Rubin, below. Mr. Rubin appeals from the judgment finding him liable for violations of the TVPA, the Trafficking Victims Protection Act. The judgment should be reversed for three reasons. I'll focus on the first, the error in the trial court's jury instructions. There was extensive evidence that each plaintiff consented to engage in BDSM relationships with Mr. Rubin. Consensual BDSM does not constitute a violation of the TVPA as this court has held in United States v. Barclay. Well, isn't that an issue here, a fact issue? You've said there's extensive evidence. The jury came to a different conclusion that there hadn't been consent. Consent was in the instructions. The jury concluded that there was at least whatever consent was given was insufficient. We don't know if the jury actually did, but it was insufficient or that it was withdrawn or they intended to withdraw it, but the conditions were such that they couldn't physically do it. Well, Your Honor, I think that the issue is precisely that, that there was instruction on consent given, but the correct instruction was not given because the plaintiff's theory was that consent had been given and then withdrawn. The jury was told if consent is withdrawn... I don't know that that's the plaintiff's theory. The plaintiff's theory was that full and informed consent was not given, that they may have signed a piece of paper consenting to something, but they didn't consent to all the stuff that followed. Well, they certainly, it was certainly the plaintiff's theory that they consented to engage in some form of BDSM activity, and at some point there were certain sexual acts the plaintiff's contended as to which they did not consent. Right. But there was nothing in the document that your client presented to these women spelled out precisely what would happen. And so all they could do is just sort of give a general consent, BDSM, and, you know, without knowing what it would entail. With respect, Your Honor, in several of the instances, first, there were discussions beforehand through text or otherwise. Furthermore, there was the document... There's no information before the jury. This was all presented to the jury. But what the jury wasn't told was that if the plaintiff, if the defendant, yes, if Mr. Rubin reasonably understood that the plaintiff consented, did not understand that she had withdrawn consent, then he could not be liable. And instead what the jury was told is if the plaintiff withdraws consent, that's the end, even if Mr. Rubin didn't understand that. And that is completely distinct from what the instruction was given, for example, with respect to the assault offense. If we look at the record and found that the record indicated that it's obvious that he knew that consent was withdrawn, or that the plaintiff in question would have withdrawn the consent under the circumstances, or was trying to withdraw the consent, then the error is harmless. Your Honor, the standard... First, in these circumstances, given his relationships with each of the plaintiffs, it cannot be said that it was harmless. It cannot be said, because he had extensive involvement with each of them, in which they did engage in similar acts throughout, and he had no reason to believe at that time that they were withdrawing consent, unless it was clearly stated. The jury could find that. And I would remind the Court that the standard, when we have an objected to instruction below that is erroneous, is that remand is required where a properly instructed jury could have found for the plaintiff. And that is satisfied here. When you look at the charge as a whole, the question of knowledge or recklessness was instructed, was given in the instruction of the elements of the claim. Why doesn't that cover? So in the consent one, the Court didn't, again, repeat the instruction about knowledge, but why isn't it sufficient that he did it initially in laying out the elements? Because he gave the instruction for consent, the incomplete instruction of consent, thus leaving the jury not clear on what was needed to find and what Mr. Rubin had to understand once consent was given. And furthermore, it was exacerbated because he gave a different and correct instruction with respect to assault. With respect to assault, he said, he said the consent defense for assault is a little bit different from a consent defense for sex trafficking. And then he said if a plaintiff led the defendant to reasonably believe that she consented to engage in the activity, then there was no liability. That's Appendix 708 and 709. So there were different instructions and the jury understood them, therefore, we presume differently. You agree that the instruction that the Court gave in response to the jury question regarding powers was correct. Yes. So what's, why doesn't that render this harmless then? That they did get the instruction that you're saying was missing, so just assume that it was missing for now. They got it. With respect, Your Honor, they didn't because that instruction was very clearly given only with respect to Ms. Powers. And it said where consent has been given and then a person is not present when the consent is withdrawn, the person who is not present must know, et cetera. That's quoted in the full at page 32 of our opening brief. There is no way to construe that to think that it applied as well to Mr. Rubin. And indeed, exactly, once again, just as with the assault instruction, there are different instructions that apply to Ms. Powers or to Mr. Rubin. Well, so just assume that Mr. Rubin would understand because he was there. So it's sort of he was there to see that the consent was withdrawn, and so now they're asking you about Powers who was not there, who missed that part of it. Well, the jury had to, it focused on Powers, but again, with respect, Your Honor, I think that a jury, a properly instructed jury, that would have to consider whether he understood the consent was withdrawn could, on the record we have, it could have found that it was withdrawn in several of the cases. Remember, he'd given each of his partners a safe word, and none of them used it except for one. Remember, he had extensive involvement with each of these plaintiffs and had reason to believe that they were consenting, and indeed, their statements both before and after the fact, in many cases immediately after the fact, would lead the jury to think that they had not. The jury, we expressed, excuse me, the jury heard evidence from each of the plaintiffs that during the episodes, they said no, they resisted, they tried to back off. Wasn't it apparent from the evidence that they were withdrawing their consent to the extent that they gave it at all? With respect, Your Honor, no. In the first place, some of them, they did not say no. There was no testimony that said no. Plaintiffs' counsel very carefully said, did you give permission to Mr. Rubin? No. Did you consent to this? No. Counsel never asked, did you say, what did you say, did you use the safe word? Counsel didn't ask that. Why is it sufficient that they said I did not consent in the circumstances, and we have to construe the evidence in the light most favorable to the plaintiffs? Well, Your Honor, I think when determining the error or not of the jury instruction, for the question of sufficiency of the evidence, one must review it in the light most favorable to the plaintiff. But for determining sufficiency and accuracy of the jury instruction, that's not so. Again, it's whether a properly instructed jury could have found. And here, when you had numerous instances of women immediately after the episode saying, that was wonderful, Ms. Lytle said, you're a great lover, Holly, immediately afterwards, the jury could read that and say, maybe she didn't strongly express and clearly express her opposition to what he was doing. That was the jury. I'm sorry? That was all before the jury. It was all before the jury, but the jury wasn't asked, wasn't directed that Mr. Rubin had to about his mens rea with respect to the consent. Mr. Rubin was there. He was watching what was happening. He saw the effect he was having on people. And to be rather blunt about it, many of these women were gagged at the time. Not exactly the easiest circumstance for withdrawing one's consent. And this was all Mr. Rubin's doing. And the jury had all this before him. The jury had it before him. I have to say that in each of the cases, people who said, some of the witnesses said, excuse me, the plaintiffs said that they were gagged or otherwise unable to speak, but they all said they were able to speak. Ms. Lytle said, even though she had tape in her mouth, she could say no and she could indicate that. Ms. Reyes testified that she did. Well, one of them said that they did withdraw, said no, no, no, although their mouth was taped, and that it was loud enough for the defendant to hear them. And, Your Honor, given the- And that's just evidence before the jury. That was evidence before the jury. The evidence was before the jury, but the question wasn't. The evidence was before the jury, and it might have found or it might not have found, because one can't say they certainly would have found, because most certainly in light of all of the evidence, all of the plaintiffs' relationship with Rubin and everything they said to him, both before and after the encounter, the jury could have found that they were not clearly expressing their consent in such a manner that he was recklessly not recognizing it. I have a question about the scope of the TVPA. Yes, Your Honor. I understand your argument to be that because there's a future tense will use force, that that makes it impossible to have the requisite mens rea at the time of the offense. And so my question is, the list of words in the TVPA is long, and several of them have a temporal meaning that seem to be ongoing. If that's right, then does that kind of address your future tense argument? So in other words, if we say patronizing or harboring is something that doesn't just happen when the encounter begins but continues through, then at some point during that ongoing patronizing or harboring, the defendant can become aware that he will use force. Does that make sense? I guess my question is, if we're interpreting some of those words to have an ongoing meaning, then doesn't your future tense argument fail? I don't think so, Your Honor. Or to be more precise, no, because the future tense applies to all of them. The future tense, it says will. So if he is harbored or is harboring someone in a continuing action but is reckless with respect to whether he will use force, then there will be circumstances where that is so. If it's ongoing, so he's in the course of harboring and then the force is used, then at some point the tenses kind of meet, if you know what I mean, present and future, and he uses the force and he knows at that moment he's using force. And I think that if he had, during the harboring, preceding the use of force, if he knew that he would or was reckless with regard to that, then the tense would be satisfied. But I don't think that's so here. One can harbor and then later use force, certainly. One can maintain and later use force, but they can't be done at the same time because that's not what the statute provides. I don't think the natural reading of patronizing or harboring is an ongoing act or had begun and ended before the force was used. But in the circumstances such that we have here, what that would do would be to turn virtually if any act, if patronizing is a short-term act or harboring is a short-term act and it's not clear that it was or wasn't here or what was the harboring or what was the patronizing, then you'd end up being, as we stated earlier, then every assault of a commercial sex worker would be a violation of the TVPA. And I think that's too broad. As we submit, that's too broad a reading of the statute. Your Honor, I reserve time. You've reserved some time for rebuttal. Thank you, Your Honor. Thank you, Your Honor. At this court, Your Honor, Brian Isaac, I represent the Appellees Hopper and Moore. Just to put this into context, I think Judge Kogan hit this nail right on the head. He's smarter than I am, and I want to read to you what he said, two sentences, because I think this puts everything in context. Quote, each of the plaintiffs testified to conduct that the jury could find. Rubin knew he was going to undertake when he brought them to New York, but plaintiffs did not. Those acts included, his words, not mine, vaginal penetration with a pool cue, clamping closed pins to breasts, insertion of electric artificial phalli, penetration while gagged, intercourse while tied up, penetration with a cattle prod, and repeated punching, slapping, whipping, and dragging while bound. Now, look, I'm not a sex expert. I'm not going to say I know about this, but that's not BDSM sex. That's just torture. And the fact of the matter is that these nuanced arguments that my adversary is making, while clever, doesn't detract from the fact that this was a very, very simple case. None of the plaintiffs claimed that they were kidnapped and transported to New York. They had an agreement with Mr. Rubin. They were brought in by third parties, who I call runners. They went to a nice hotel. They went to nice restaurants. They had wine. They thought they were going to be engaged in BDSM role playing, and that's what they got. Can we pick up where I left off with Mr. Rosenberg about whether harboring, patronizing, and some of these other words are ongoing? He responded that this would turn into a federal TBPA crime, really any kind of sexual assault that involves interstate, that has an effect on interstate commerce. What's your response to that? My response is it's just not true. As Judge Kogan pointed out, those terms temporarily are relevant with respect to ongoing actions. But if we read those broad words to be ongoing, like as you want us to, harboring, patronizing, then that seems to encompass any kind of use of force in the course of a sexual encounter. We still need to have the other elements of the TPA, which is the transportation and the commerce. But as well, I have even an easier argument for you, which is the one that Judge Kogan actually addressed, which is that this was a situation where Rubin's intent was actually manifested at the time that he did the running. Remember, you can't prove a negative. I can't prove what somebody's going to think or what they're not going to think. The whole methodology, the modus operandi that he used was to get third parties, to get women who essentially couldn't protect themselves, who might have had some problems, weren't stable to come to New York. And then, as the court said below, he enticed them to come here and then engaged in acts that they could never, ever anticipate. I mean, I'm sorry. Nobody can tell me that BDSM sex could include the pool. I understand that point, but I guess my concern is that, presuming that the other elements are satisfied, the interstate commerce piece of it and the mental state, why wouldn't any kind of sexual assault then become a federal crime? Well, I think in this situation, when you're looking at the term, there's also the term reckless. So I'm not sure that every single sexual assault case would actually turn into a TVPA crime, but here the elements are present. You have a basic plot or plan that was conceived at the time they were here, and then a continuation of this act. Remember, my adversary's position actually supports what I'm saying. His position is that these women came here knowingly, that there is a question of fact as to the extent of what they were doing, but the escalation of it can, in fact, transpose what would otherwise not be a TVPA case into a case that is a TVPA case. And there has to be trafficking. Yes, there has to be trafficking. That's what it is. It's a sex trafficking act. So it doesn't deal with a state court matter or even a federal court matter that doesn't deal with that. The whole purpose of the TVPA, I don't think my adversary disputes this, is to make sure that this type of act doesn't occur. And in fact, as you know, the TVPA has been consistently expanded to now provide both criminal remedies and civil remedies as well. So to me, you're not criminalizing or federally criminalizing every single act. You have to have certain requisite elements. And if you're transported and if this conduct occurs to you, then the TVPA was designed to protect you and should protect you. And let's be clear. This was a clear jury question. We lost on summary judgment. And the court's charge, as far as I can tell, on consent, on sex, on withdrawn consent was very, very favorable. So to me, what we have is we have a jury question case, no basis to set it aside. I don't believe the argument that the state of mind of Rubin results in a non-suit as a matter of law. And I see my time's up. I just want to add one thing. On the punitive damage claims, according to my reading of the case law, every single circuit and every single district court that I have seen has allowed punitive damages in a case like this. I think it would be congruent with the intent of the statute and the intent of the legislature to allow it. Thanks for listening to me. I'll let my co-counsel speak to you now. Thank you, counsel. Mr. Schmidt. Good morning, Your Honors. May it please the Court. Matthew Schmidt for Plaintiff Helen E. Lytle and below. If I may start with Judge Park's question he asked to Mr. Isaac. I think that the reason that it does not cover any sort of sexual assault is because, in addition to what Mr. Isaac said, is there is the commercial element. So a simple, mere sexual assault, as it were, would not be covered by that. To the extent that it does I mean, how hard is that to satisfy? Travel across state lines? Payment across, you know, using wires? That's not too hard, right? Well, I mean, it might not be hard to satisfy in terms of facts, but it does cover a specific category of conduct in which a person is being paid for a sex act. And I think that that is very much the intent of the TVPA, to make it risky if a person So you want us to have a broad reading of the words of the TVA and then restrict it based on the intent of it? Yes, Your Honor. I would say that the Well, obviously the state of mind and the intent of the perpetrator. They need to recklessly know that force is being used or rather will be used to cause there to be a force of the commercial sex act that would occur. And it does cover a broad range of situations, but that is included in traditional sex trafficking, such as people who are forced to engage in sex in so-called massage parlors or strip clubs or brothels. And the TVPA in, for instance, the 2008 amendment was even clarified to make sure that the customers of those businesses do face liability under the TVPA because those are particularly vulnerable people who Congress intended to protect. And of course, this is, as Mr. Isaac said in a brief show, this is a more extreme situation than that. So the court does not need to reach necessarily those relatively edged cases. But I do think that is consistent with the intent. So the evidence is that some or all of these women kept coming back, even though they had had the prior experiences with Mr. Rubin. How do you deal with the issue of consent when they've been through it and yet they come back? Well, I think that's a fact issue, Your Honor, because for most of these women, they came back multiple times and sometimes There's no dispute that they came back. So what's the fact issue? The fact issue is whether Rubin reasonably believed that they were consenting to the specific conduct because the situation was, maybe the women came back, but there were instances between in which they did not complain, in which there was not an assault, it was not exceeded. So the fact question is whether Rubin, reading the situation under the recklessness standard, should have known that they were not consenting to certain kinds of conduct. And as the record shows, all of the women, when it was reaching a point in which it exceeded certain bounds, they were communicating one way or another they weren't consenting to it. There was the crying, there was the attempts to squirm. So isn't that an argument in favor of your friend's point, that if you're talking about consent being given and withdrawn, shouldn't it be instructive that the jury should know whether Rubin knew or not, or recklessly disregarded, whether consent had been withdrawn? Well, I think that they were instructed on consent. I mean, in pages 29 and 30 of the brief. Well, their whole first argument is that the mental state was not added to the consent instruction. Well, I think that, I think the language covers realistically what Mr. Rubin is complaining about, because he would need to, if he recklessly disregards that the mental state will be satisfied, then that covers a situation in which, you know, as he's alleging, consent is withdrawn, but he could not know. Because this isn't a situation. But I guess his mental state is important if you're talking about a scenario where consent is being given and withdrawn. This is okay, that's not. I'm back here for more, but that's not okay. Like, then it suddenly becomes more important to know what exactly the consent is for. I agree, Your Honor. And I think that Mr. Rubin could determine that from the circumstances of the encounters as testified to by the plaintiffs. There's a proposition that he was just trying to, by having his written statements, to sort of cover himself a little bit in terms of obtaining consent, but without revealing what really was going to happen to them, because they wouldn't consent to that if he'd spelled it out. Maybe he didn't even know what was going to happen to them, and then he just acted on his own in the heat of the moment, if you will, to engage in more extreme behavior. And what's your response to these written consents? I think, Judge Walker, that most likely he did have a specific intent that he was trying to lead the women on. I think that's most likely. But as Judge Kogan, I think, noted well in his opinion, it's also possible that maybe he just very badly misread cues. He lost himself in the moment when it happened. But even if that were the case, as Judge Kogan put forth, the evidence is such that it happened so many times that he should have been able to read, and at least the jury could have determined from that, that he was going well beyond what these women understood them to be agreeing to. Okay. Thank you, Counsel. Thank you, Your Honor. We'll hear rebuttal. Thank you, Your Honors. A few points briefly in response to the points raised by my colleagues. First, to begin at the end, my colleague says there were so many times. But that seems to go, that goes to the point. Remember, there were numerous occasions that are not complained of here. There were numerous occasions that he engaged in sex and wasn't complained of and was responded to with apparent and real consent that people wanted to come back. So that goes directly, directly to his mens rea and what he understood. The question, according to my colleague, is did Rubin really believe that they were consenting? Just because they don't complain of certain circumstances doesn't necessarily mean that anything goes. But, you know, he still can act in an extreme way that no reasonable person would conclude they consent. Your Honor, absolutely correct. And the jury had to be instructed as to what Mr. Rubin's mens rea was with respect to the consent, and it wasn't. And if it had been, then the jury would have found what the jury would have found, and we wouldn't have an argument. But it was not, and that's why we do. And, you know, my colleague also spoke about, you know, describe, you know, in vivid terms what had happened, and it is shocking, I grant you that. But there's a world of people out there, and he said that's not BDSM sex. I am no sex expert either. But BDSM sex is a broadly used term. It is different people do engage in different things, consenting adults in private. Mr. Rubin. Could a reasonable jury have found that these women consented to some of the more extreme acts, being stuck with a cattle prod or a pool cue or having a rib broken or being repeatedly pummeled? Your Honor, with respect, the answer is yes.  I think the only case that I've – The position is the jury could reasonably find that these women consented to those extreme acts. Your Honor, that those acts were consentable to, and the jury could most certainly have found that they consented or he reasonably believed that they did. You'll remember, Your Honor, with respect, Your Honor mentioned the pool cue, which is certainly a vivid thing. There had been play, sexual play, with the same partner for a period of years, five years with Ms. Tagay, the same partner, during which they'd used a number of sexual implements, and indeed she purchased them, including prosthetic devices. And so the pool cue was different, and she said she didn't want it, and he removed it. And then, I would note, they then went on to engage in other sex in that circumstance, in that occasion, with no – and that was not objected to. Your Honor's also asked about – and Your Honor asked about the point of harboring and about the temporal element of that. I point out, though, that even with respect to the harboring and the patronizing, there's the problem of the interstate commerce, because it has to be the way the statute was read. Whoever knowingly verb, verb, verb, you know, doing something, it'll affect the interstate commerce, knowing that that will – that forced fraud or coercion will be used. So when he was patronizing someone, let's say, if one determines that having a person in his apartment is – that's patronizing, there's no evidence that that affected interstate commerce. The only evidence of interstate commerce was when he invited women to come, which didn't happen on all occasions, or when flew them in, which happened on some occasions. My colleague said, well, the intent was manifested at the time of the – at the time of the transportation. He said the intent was manifested. That's not true. And, indeed, Klage's counsel expressly disavowed that theory below, and I respectfully refer the Court to Supplemental Appendix at page 1633, because at that place, on direct examination of Mr. Rubin, Mr. Rubin was – we asked him to testify about what he understood and what he understood certain Ms. Moore and Littell to be saying to him when they were in Florida, and a counsel objected, and he said, quote, I don't think his – that is, Mr. Rubin's – state of mind at this stage matters. I think it's more a state of mind when he actually ends up meeting them. So his position was always that what mattered was not the state of mind, the enticement, if I can call it that, or a solicitation stage, but only in the room and in the moment. Unless the Court has further questions. Thank you, counsel. Thank you. Thank you both. We'll take the case under – all three of you. We'll take the case under advisory.